(12 Misc. Rep. 248.)

## In re O'ROURKE.

(Surrogate's Court, Westchester County. April, 1895.)

1. WITNESS—TRANSACTIONS WITH DECEDENT—PARTIES IN INTEREST.
   Code Civ. Proc. § 829, forbidding a party to an action to testify as to a personal transaction with a decedent, does not apply to the officers of charitable institutions who serve without pay.

2. STATUTE OF FRAUDS—AGREEMENT TO PURCHASE CEMETERY LOTS.
   Laws 1881, c. 501, providing that any cemetery company "may sell lots or plats * * * subject to such conditions and restrictions as may be imposed" on their use, and regulating the execution of the "conveyance,"

provides for the sale of an easement, and not a mere license; and therefore a contract to purchase such lot must be in writing under the statute of frauds.

Petition by Emily A. O'Rourke, as administratrix of Martin O'Rourke, deceased, for leave to sell decedent's real estate for the payment of debts.

Rob't J. Fox and John M. Perry, for petitioner.

F. V. Van Kleck, Jr., special guardian.

SILKMAN, S. The objection of the special guardian of the infant heirs at law to the allowance of a claim of St. John's Roman Catholic Church of $450, alleged to be one of the debts due by decedent, to pay which this proceeding is taken, presents a question which has required much consideration. It is sought to sustain the claim solely upon the ground that it is a debt of decedent. Martin O'Rourke died May 21, 1893, intestate, and without sufficient personal property to pay his debts. On May 18th, prior to his death, he went to Calvary Cemetery, owned by and connected with the Church of St. John the Evangelist, with Father Tole, its treasurer, and, after looking at several plots, concluded to take one at the price of $450, and then and there paid $10 on account, and such treasurer thereupon opened an account in his book of accounts, charging said decedent with $450, and crediting him with the $10 payment. No written agreement of any kind was entered into, and no further payments were made. The body of the decedent was buried in the plot by his widow, although he owned a plot in another cemetery at the time of his death. Father Tole testifies that when plots were paid for in full a receipt is given in the following form:

No.                    Mount Calvary Cemetery.

"Office:                                      The Rectory,
                                        "White Plains, N. Y.

"Received from —— —— dollars, for the privilege of burial in Mount Calvary Cemetery, in —— graves, in plot ——, section ——, in the mode used and permitted by the trustees of St. John's Church, White Plains, N. Y., subject to the rules and regulations that have been or may be adopted from time to time by said trustees, and to the laws, usages, and discipline of the Roman Catholic Church in the Archdiocese of New York relating to sepulture, as well as the rites and ceremonies to be observed at funerals, and subject also to the consent and approval of said trustees for erecting tombstones, monuments, and other constructions thereon; it being understood that no deed or conveyance of any title or interest in the said land is to be executed, but that the whole title thereto, and the legal possession thereof, remain in the said trustees, and also that this privilege is not to be transferable or assignable, by act of law or otherwise, without the consent in writing of the said trustees.

"Dated, White Plains, ——, 189–.

"————————,
"Treasurer of Mount Calvary Cemetery.

"$————."

But it does not appear that this fact was known to decedent. Father Tole had no pecuniary interest in the transaction, and no personal benefit accrued to him by reason of the sale of the burial plots, either directly or indirectly. The administratrix admits the claim, and her counsel states to the court that she desires to have the

same allowed.    Some question has been made as to the power of the surrogate to determine the claim.    The Code, however, is clear and explicit (section 2755), but whether the power conferred is intended to give more than the right to determine what are presumptive debts only it is not necessary to determine.    The decree of the surrogate is certainly binding upon the heir or devisee.    The administratrix urges that, because the claim is admitted, the surrogate's power to determine whether or not it is a prima facie debt is gone, and also urges that the same rule applies as is applied in cases where a debt of deceased is paid in good faith by the executor or administrator, and the burden is put upon the contestant to show that the debt did not exist.    This rule cannot be extended to the present case, and only applies where there has been a payment in good faith.    The fact of payment and the fact of good faith are essential to the shifting of the burden of proof from the executor or administrator to the contestant.    In this case there has been no payment by the administratrix, and legal good faith would not be consistent with a knowledge that there was no written agreement in existence for the payment of the money.    An executor or administrator has no power to waive, as against the heirs at law or devisees, any legal defense, either under the statute of limitations or the statute of frauds; and, if they do so, it is at their peril.    A payment of a claim which is either outlawed or barred by the statute of frauds, within the knowledge of the administrator, cannot be said to have been made in good faith. The parol agreement here claimed rests upon the testimony of the witness Father Tole, and his testimony, the special guardian urges, is incompetent, under section 829 of the Code of Civil Procedure; but in this the special guardian is in error.    The interest which excludes a witness under the section cited is a pecuniary one.    Such is not Father Tole's.    He does not personally benefit by the sale of the burial plot, and, while he is an officer, he is only such ex officio, and the interest he has is entirely one of sentiment, the interest which every lot owner would have in the success of the cemetery.    Nothing of value comes to him by reason of the transaction as to which he testifies, and it is therefore not the interest contemplated by the Code.    The section was not intended to exclude the officers or trustees or religious or charitable institutions, serving without pay or reward.

The serious question is as to whether the claim for the balance of the purchase price of the burial plot is not within the statute of frauds, and therefore not enforceable.    To determine this question it is necessary to ascertain from the surrounding circumstances what must have been in the mind of the decedent at the time of the alleged agreement, and upon what the minds of the parties met.    In other words, what was the agreement, the evidence as to which is so meager. All we have is the statement of decedent that he would take the lot, and that he paid $10 on account of the purchase.    Did the decedent have in mind that he was to have a grant giving him a fee or an easement subject to the proprietary rights of the corporation, or a lease for a term, or a receipt entitling him to a mere license to bury?    If the agreement was for a grant or a lease, it would be clearly within the statute of frauds, and no claim can be predicated upon it.    On

the contrary, if it was an agreement for a mere license, it may be by parol, and therefore not within the statute. It is claimed that under the rules and regulations of the church there was no authority to give the purchaser of a plot other than the receipt above quoted, which would confer merely a license to bury; and it is also claimed that the purchasers were presumed to know the rules and regulations and to have bought subject to them. There is no doubt as to the latter proposition, with certain limitations. The rules and regulations, which a purchaser is presumed to know, are such as are contemplated by the law. By chapter 501 of the Laws of 1881 it is provided that:

"Any incorporated religious society within the state of New York who now has or may hereafter hold or acquire lands for the purpose of a burial place or cemetery may sell lots or plats in such burial place or cemetery upon such terms as may be agreed, subject to such conditions and restrictions as may be imposed upon the use of such lots or plats by the rules and regulations now adopted, or hereafter to be adopted, by such religious corporation. The conveyance shall be executed under the common seal of the corporation, and shall be signed by a majority of the trustees of the corporation making such sale."

It will be seen that the rules and regulations provided for apply only to the use of the plats, and not to the title or interest in the land which the purchaser takes. The act also provides for a deed to be given the purchaser, and directs the manner of execution, and by whom it shall be executed. If Martin O'Rourke is to be presumed to have known anything, it must be the statute quoted, which provides for a grant, and a grant only. There is not a word or suggestion about a burial license. The act also provides that remains shall not be removed where compensation is paid, except upon a vote of three-fourths of the congregation, and the expense of removal to be paid by the church, which provision is wholly inconsistent with the idea of a license, which is personal and revocable. But without the aid of the statute it may be said that the very nature of the right of sepulture implies a right in land lasting in its character. The final resting place of the dead should be undisturbed and inviolate. For no interest in land, other than an absolute fee, can there be claimed a greater right of permanency. It is sacred in its nature. No one would be presumed to have selected as a place of burial one in which his or her remains could lie only during the pleasure and subject to the whim of a corporation, religious or otherwise. The right of sepulture in its very nature implies an easement. It is an incorporeal hereditament. It is true that burials in cemetery plots may be prohibited, and bodies disinterred and reinterred elsewhere, even though there be a grant of the fee to the burial plot; but this can be done only by legislative authority, and where for sanitary or other sufficient reasons it becomes necessary; the health of the living being of more consequence than the repose of the dead. The characteristics of a license are repugnant to the idea of a burial place. A license is personal and revocable. Washb. Real Prop. c. 12, § 2. In this it differs from an easement, which can only be founded upon a grant or by prescription. If the alleged agreement was for a license, the right of burial ceased with the death of Martin O'Rourke;

and if he had continued to live it could have been terminated at any time at the election of the corporation. If the agreement was for the permanent occupation of the burial plot, by whatever name such occupation might be called, the very object sought to be attained by the statute of frauds would be defeated. Savage, C. J., in Mumford v. Whitney, 15 Wend. 381, says: "To decide that a right to a permanent occupation of the plaintiff's land may be acquired by parol, and by calling the agreement a license, would be in effect a repeal of the statute of frauds." The reason why a license may be created by parol is because it is personal, and revocable. The cases of People ex rel. Coppers v. Trustees of St. Patrick's Cathedral, 21 Hun, 184, and McGuire v. St. Patrick's Cathedral, 54 Hun, 207, 7 N. Y. Supp. 345, do not affect the question here, as in those cases the agreement was executed, and not executory. Neither was it necessary to the disposition of those cases that the interest of the plot holder should be held to be only that of a licensee. In the Coppers Case, however, the court distinctly hold that under the receipt there given no action could be maintained, as the agreement was void under the statute of frauds. See, also, case of Conger v. Treadway, 50 Hun, 451, 3 N. Y. Supp. 152. The conclusion is irresistible that the agreement was not for a license, but for an interest in land. The claim that, because the remains of Martin O'Rourke were interred in the plot in question by the administratrix, there has been a part performance, is not tenable. Part performance must be with the knowledge and consent of the contracting party, his heirs or assigns. The act of the administrator cannot bind the heirs. The claim of the Church of St. John the Evangelist is disallowed. Ordered accordingly.